282 F.3d 220
 In re DIET DRUGS (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation, Lydia D. Gonzalez, Jo Ann Gorena, and Maria I. Smith, on behalf of themselves and the certified Texas Gonzalez class of all other similarly situated individuals and class counsel for the certified Texas Gonzalez class, Appellants.
 No. 00-1393.
 United States Court of Appeals, Third Circuit.
 Argued October 9, 2001.
 Filed February 26, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John W. MacPete (Argued), Grand Prairie, TX, Keith M. Jensen, Fort Worth, TX, for Appellants.
 Peter L. Zimroth (Argued), Arnold & Porter, New York, NY, Robert D. Rosenbaum, Arnold & Porter, Washington, DC, Michael T. Scott, Reed Smith, LLP, Philadelphia, PA, for Appellee, American Home Products Corporation.
 Arnold Levin (Argued), Levin Fishbein Sedran & Berman, Philadelphia, PA, for Appellees, Brown Class Representative Plaintiffs.
 Before: SCIRICA, GREENBERG and COWEN, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 In this matter involving competing mass tort class actions in federal and state courts, we address an interlocutory appeal in a complex multidistrict federal class action comprising six million members from an order enjoining a mass opt out of a state class. We will affirm.
 
 I.
 
 2
 The underlying case involves two drugs, both appetite suppressants, fenfluramine — marketed as "Pondimin" — and dexfenfluramine — marketed as "Redux." Both drugs were in great demand. Between 1995 and 1997, four million people took Pondimin and two million people took Redux. In 1997, data came to light suggesting a link between the drugs' use and valvular heart disease. In July 1997, the United States Food and Drug Administration issued a public health advisory alert. On September 15, 1997, American Home Products removed both drugs from the market. Subsequent clinical studies support the view the drugs may cause valvular heart damage.
 
 
 3
 Following the FDA's issuance of the public health warning, several lawsuits were filed. The number of lawsuits increased exponentially after American Home Products withdrew the diet drugs from the market. Approximately eighteen thousand individual lawsuits and over one hundred putative class actions were filed in federal and state courts around the country. American Home Products removed many of the state cases to federal courts, increasing the number of federal cases. In December 1997, the Judicial Panel for Multidistrict Litigation transferred all the federal actions to Judge Louis Bechtle in the United States District Court for the Eastern District of Pennsylvania, creating Multidistrict Litigation 1203 ("MDL 1203").
 
 
 4
 In April 1999, American Home Products began "global" settlement talks with plaintiffs in the federal action together with several plaintiffs in similar state class actions. The parties reached a tentative settlement agreement for a nationwide class in November 1999. Known as the "Brown class," the proposed class included all persons in the United States, as well as their representatives and dependents, who had ingested either or both of the diet drugs. The global settlement contemplated different kinds of relief, including medical care, medical screening, payments for injury, and refunds of the drugs' purchase price.
 
 
 5
 The purchase-price-relief provisions were separated into two sections, one for those who had taken the drugs for sixty days or less, the other for those who had taken the drugs for more than sixty days. Short term users were to be paid $30 per month's use of Pondimin, and $60 per month's use of Redux. Long term users would receive the same amounts per month, subject to a $500 cap and the availability of sufficient money in an overall settlement fund. Unlike short term users, long term users were entitled to other benefits, such as medical screening.
 
 
 6
 The District Court entered an order on November 23, 1999, conditionally certifying a nationwide settlement class and, concurrently, preliminarily approving the settlement. To opt out, a class member was to "sign and submit written notice to the Claims Administrator[s] with a copy to American Home Products, clearly manifesting the Class Member's intent to opt out of the Settlement." The opt-out period extended until March 23, 2000. The court scheduled a fairness hearing for May 1, 2000 on class certification and final settlement approval. On August 28, 2000, the District Court entered a final order certifying the class and approving the settlement.
 
 
 7
 In July 1997 — after the FDA warning, but before American Home Products withdrew the drugs from the market — appellants filed a putative class action in Texas state court, Gonzalez et al. v. Medeva Pharmaceuticals, Inc., et al. The Gonzalez case was one of the first cases filed and preceded the creation of MDL 1203 by several months. The proposed Gonzalez class, including all Texas purchasers of the two diet drugs, was a subset of what would become the Brown class. The Gonzalez action was limited insofar as it sought actual purchase-price recovery only, together with treble damages under the Texas Deceptive Trade Practices Act-Consumer Protection Act ("DTPA"), Tex. Bus. & Comm.Code, § 17.41 et seq.
 
 
 8
 The Gonzalez complaint did not allege a federal cause of action and the named parties were not diverse. Nonetheless, in January 1998, American Home Products removed the case to federal court shortly after MDL 1203 was created, contending federal diversity jurisdiction obtained. American Home Products asserted Medeva Pharmaceuticals, a non-diverse defendant, was fraudulently joined for the purpose of defeating diversity jurisdiction. Soon after removal to the United States District Court for the Southern District of Texas, the Gonzalez case was transferred to the Eastern District of Pennsylvania as a part of MDL 1203.
 
 
 9
 Shortly thereafter, the Gonzalez plaintiffs moved to remand the case back to Texas state court, contending Medeva Pharmaceuticals was a proper defendant. The Gonzalez plaintiffs also argued the amount-in-controversy requirement was not met, as purchase-price recovery would only amount to a few hundred or, perhaps, a few thousand dollars per plaintiff. Furthermore, they argued they would not be seeking statutory attorneys' fees under the ;Texas DTPA. As noted, on November 23, 1999, Judge Bechtle granted conditional certification of the Brown class and preliminary approval of the settlement. On February 15, 2000 — during the MDL 1203 opt-out period — the District Court granted the Gonzalez plaintiffs' motion for remand, finding that Medeva Pharmaceuticals was a proper defendant.
 
 
 10
 One month later, on March 14, 2000, the Gonzalez plaintiffs filed a new complaint, their "Fifth Amended Class Action Petition," in the District Court of Hidalgo County, Texas. They dropped their class claims against Medeva Pharmaceuticals and claimed entitlement to statutory attorneys' fees. Accordingly, American Home Products contends, the barriers to federal diversity jurisdiction were removed.
 
 
 11
 Less than a week later, on March 20, 2000, the Hidalgo County court held a hearing on certification of the Gonzalez class. On March 22, it certified the class, defined as "all persons who purchased dexfenfluramine (Redux) and/or fenfluramine (Pondimin) in Texas, who are solely seeking the recovery of the amounts to acquire same, as well as any statutory trebling which may result from the claims asserted under the Texas Deceptive Trade Practices Consumer Protection Act." The certification of the Gonzalez class occurred eight days before the end of the opt-out period for the Brown settlement. At this time, most members of the Gonzalez class were also members of the Brown class, except for those who had individually opted out.
 
 
 12
 On March 22, the same day as the entry of the Texas class certification order, the Gonzalez plaintiffs acted to erase this overlap, by moving, in Hidalgo County, for a court order opting out all of the unnamed members of the Gonzalez class from the Brown class. The Texas court scheduled a hearing for 9:00 a.m. the next morning. In response, American Home Products sought a temporary restraining order in the District Court for the Eastern District of Pennsylvania, the MDL court, seeking to prevent the Gonzalez class from implementing a mass opt out.
 
 
 13
 On March 23, hearings were held in both courts on their respective motions. In Texas, the Hidalgo County court held its hearing and the same day entered an order partially opting out the Gonzalez class from MDL 1203. The District Court for the Eastern District of Pennsylvania also issued an order that day, granting American Home Products's motion and entering a temporary restraining order directed against the relief sought at the Texas hearing. The federal order denied the effect of the sought-for opt out and ordered Gonzalez class counsel to refrain from pursuing the opt out. It was to remain in effect for ten days. A hearing was scheduled for March 29 "on whether to make the injunction permanent." The District Court's order was dated, "March 23, 2000 at 11:55 A.M." For what it is worth, the Hidalgo County court would later issue an order "clarifying" that its opt-out order had been issued before 11:55 Eastern Time.
 
 
 14
 The Texas opt-out order purported to opt out the Gonzalez class from MDL 1203 only partially:
 
 
 15
 [I]t is ... ORDERED, ADJUDGED AND DECREED that the unnamed members of the certified class in this case be [sic] are hereby opted-out of the proposed settlement in MDL 1203, solely to the effect that their purchase price recovery claims, and potential DTPA trebling of same, will be pursued in this case, accordingly, any and all of their other claims, including but not limited to, claims for medical screening, medical monitoring, personal injury, mental anguish and/or punitive damages are not effected [sic] by this order.[1]
 
 
 16
 Gonzalez v. Medeva Pharm., Inc., No. 4223-97B, at 3 (Tex.Dist.Ct. Mar. 23, 2000). The Texas court also ordered "that Class counsel shall take all other steps necessary, if any, to opt-out the entire certified class in this case from the proposed settlement in MDL 1203 to the extent, and only to the extent, set forth in the preceding paragraph." Id.
 
 
 17
 On March 28, American Home Products took further legal action. First, it filed a second notice of removal to the United States District Court for the Southern District of Texas, contending diversity jurisdiction obtained at that time. It also filed — together with lead counsel for the Brown class — a motion for a permanent injunction and declaration with respect to the Hidalgo County court's attempt to opt out the unnamed Texas plaintiffs.[2]
 
 
 18
 On March 29, the District Court held a hearing on American Home Products's motion for a permanent injunction and declaration. One of the Gonzalez class's attorney's, John W. MacPete, was admitted pro hac vice for the purpose of opposing the motion. At the hearing, Judge Bechtle announced his intention to enter the permanent order sought by American Home Products and Brown class counsel, stating the order of the Hidalgo County court would "interfere with this Court's jurisdiction and the administration of this case, as well as the right and obligation of this court to bring this proceeding to a final judgment." On April 6, 2000, the District Court issued a written order, PTO 12270 — the subject of this appeal.
 
 
 19
 PTO 1227, entitled "Permanent Injunction and Declaration Regarding Purported Class-Wide Opt-Outs," contains two main parts. The first is an injunction directed primarily at counsel for the Gonzalez class:
 
 
 20
 Counsel for the named plaintiffs in Gonzalez v. Medeva Pharmaceuticals, Inc., et al., originally filed in Hidalgo County, Texas ... and removed to the United States District Court for the Southern District of Texas on March 28, 2000, and all those acting in concert with them, are hereby permanently enjoined from taking any action to effect, secure, or issue notice of any purported class opt out, on behalf of the unnamed absent members of any class which may have been certified in Gonzalez, from the class action settlement which this Court has conditionally certified and preliminary [sic] approved....
 
 
 21
 PTO 1227, at 2.
 
 
 22
 The second part is declaratory in nature. It states, "Insofar as the Hidalgo County order purports to affect or determine the opt out status of any member of the MDL 1203 class it is null and void and of no effect." The District Court also stated, "The Hidalgo County's order is also null and void and of no effect insofar as it purports to authorize or effect a partial opt-out on behalf of any member of the MDL-1203 class." Id. at 2-3. This was because the Texas order "interfere[d] with [the District] Court's authority to determine the means and methods by which members of such class may elect to opt out of the MDL-1203 class." Id. at 2.
 
 
 23
 On April 26, 2000, the Gonzalez plaintiffs moved to remand Gonzalez back to state court a second time. The remand motion was considered in the federal District Court for the Southern District of Texas on May 3. That court declined to rule on the motion, referring it instead to Judge Bechtle, assuming Gonzalez would be referred to his court as part of MDL 1203. On May 12, the MDL panel transferred Gonzalez to the Eastern District of Pennsylvania. American Home Products contends the Gonzalez plaintiffs made no attempt, following transfer, to seek resolution of the remand motion by Judge Bechtle in the Eastern District of Pennsylvania. In any event, no action has been taken directly on the Gonzalez matter in federal court since its transfer in May 2000.
 
 
 24
 The day after they filed their motion to remand, the Gonzalez plaintiffs filed a notice of appeal of PTO 1227. Both American Home Products and Brown class representatives are appellees.
 
 
 25
 On August 28, 2000, Judge Bechtle issued a final order certifying the Brown class and approving the settlement.[3] The Gonzalez case was, at that time, one of the cases consolidated under — and settled as part of — MDL 1203. Judge Bechtle also issued, concurrently, a blanket injunction against commencement or prosecution of parallel actions in other courts.
 
 
 26
 Appellants challenge PTO 1227 on several grounds. Their principal arguments address whether the District Court overstepped the limitations on its power with respect to state court actions. Appellants contend the District Court's order: (1) violates the limitations on federal courts enjoining state court proceedings under the Anti-Injunction Act; (2) fails to afford the Texas order full faith and credit; and (3) violates the Rooker-Feldman doctrine's prohibition on lower federal courts' reviewing state court decisions. Additionally, they challenge the District Court's personal jurisdiction over the Gonzalez plaintiffs and their counsel.[4]
 
 II.
 
 27
 "Because there `exists a strong policy to conserve judicial time and resources,' we have held that `preliminary matters such as ... personal jurisdiction ... should be raised and disposed of before the court considers the merits or quasi-merits of a controversy.'" Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir.1999) (quoting Wyrough & Loser, Inc. v. Pelmor Labs., Inc., 376 F.2d 543, 547 (3d Cir.1967)). Accordingly, we turn first to appellants' challenge to the District Court's in personam jurisdiction.[5]
 
 
 28
 Because the District Court enjoined counsel for the Gonzalez plaintiffs from pursuing the mass opt out, it must first have obtained personal jurisdiction over these attorneys. Appellants deny the court either had jurisdiction over members of the Gonzalez class or their attorneys.
 
 
 29
 Ordinarily, in personam jurisdiction depends on sufficient minimum contacts with the forum, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quotation omitted). The "minimum contacts" requirement is satisfied where a class member has received adequate notice of the action and has been afforded an opportunity — but has declined — to opt out of the lawsuit. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); see also Carlough v. Amchem Prods., Inc., 10 F.3d 189, 201 (3d Cir.1993) ("[P]rior to notice and the opt out period, and absent minimum contacts with the Pennsylvania forum or consent to its jurisdiction, a federal injunction enjoining state action would violate due process."). The Court in Shutts also stated, "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." 472 U.S. at 812, 105 S.Ct. 2965.
 
 
 30
 Appellants do not contest the adequacy of the notice sent to the unnamed class members in Texas. Because any remaining unnamed class members had not opted out of the Brown class, all unnamed Brown class members were subject to the jurisdiction of the District Court for purposes of MDL 1203, so long as they were adequately represented. The named Gonzalez plaintiffs had opted out of the Brown class, so they may not be properly deemed to have impliedly consented to jurisdiction under the Shutts rule. 472 U.S. at 812, 105 S.Ct. 2965; see also Carlough, 10 F.3d at 199 ("A plaintiff class member who is afforded an opportunity to opt out, but who fails to exercise that option, may be deemed to have consented to jurisdiction."). Regardless, the substantial majority of the Gonzalez class was subject to Shutts jurisdiction, assuming adequate representation.
 
 
 31
 Appellants contend, however, the members of the Gonzalez class were not adequately represented by the named Brown plaintiffs. They argue the interests of the Gonzalez plaintiffs — who are seeking only purchase—price recovery — are at odds with the interests of many of the Brown plaintiffs — a subset of whom seek recovery for injuries, including the possibility of future injuries. Appellants cite several cases in which settlements have been rejected for inadequate representation where there were competing subclasses. E.g., Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (finding impermissible conflict between plaintiffs exposed to asbestos during period manufacturer was fully insured, and those exposed later); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Appellants also contend the purchase-price relief contemplated by the settlement is substantially less than that sought in Gonzalez.
 
 
 32
 That various subclasses in the Brown class could find themselves in competition does not by itself establish an actual conflict undermining adequacy of representation. In its final certification order, the District Court made extensive findings supporting the opposite conclusion. In particular, it found (1) there were no trade-offs between the classes; (2) the benefits had been bargained for separately; and (3) there was no conflict between those seeking future benefits and those seeking them immediately. Appellants have challenged none of these findings. For this reason alone, there is no basis on which to find actual conflicts sufficient to establish that purchase-price-only plaintiffs were not adequately represented. Accordingly, the District Court had personal jurisdiction over all unnamed members of the Brown class, including those also members of the Gonzalez class. Because the District Court had personal jurisdiction over members of the Gonzalez class, it also had jurisdiction over attorneys purporting to represent, and act on behalf of, that class-a subset of the Brown class. Cf. Carlough, 10 F.3d at 201 (affirming finding of jurisdiction underlying injunction aimed at out-of-state class members and their attorneys and representatives).
 
 
 33
 Furthermore, the relief sought in Texas was squarely aimed at MDL 1203 and at the status of the Texas plaintiffs in that action. As such, the attorneys — and therefore, the named Gonzalez plaintiffs on whose behalf they acted — "should reasonably [have] anticipate[d] being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Consequently, no "traditional notions of fair play and substantial justice" are offended by the District Court asserting jurisdiction over either these plaintiffs or their attorneys.
 
 III.
 
 34
 Appellants' central arguments — those based on the Anti Injunction Act, the Full Faith and Credit Act, and the Rooker-Feldman doctrine — all address constraints on the District Court's authority to limit state court actions and their effects. But American Home Products maintains it is unnecessary to address these arguments because it had removed the case to federal court a second time before entry of PTO 1227, thereby dissolving any possible state-federal conflict.
 
 
 35
 American Home Products contends its filing of the removal notice immediately defeated the jurisdiction of the state court, placing it in the federal court.[6] After removal, interlocutory orders of the state court are transformed into orders of the court to which the case is removed.[7] Thus, they contend, the Hidalgo County court order purporting to opt Gonzalez class members out of the Brown class was, at the time of PTO 1227, an order of the federal court. And it remains so, as the Gonzalez case has not since been remanded. If there were a jurisdictional conflict, American Home Products contends, it was between two federal courts, not between a federal and a state court.
 
 
 36
 We do not believe resolution along these lines is so clear cut. PTO 1227 was essentially a reiteration of the District Court's original temporary restraining order, which had been issued before the second removal and was effective for a ten-day period. Removal, therefore, occurred during the effective period of the District Court's temporary restraining order blocking the effect of the Texas order — in the midst of a conflict between the federal and state courts. By filing a removal notice during the pendency of the temporary restraining order, American Home Products attempted to resolve a significant existing dispute involving difficult issues of federal and state authority. And it did so in the face of an existing-if potentially modifiable[8] — ruling remanding the case for lack of subject matter jurisdiction.[9]
 
 
 37
 This case illustrates the remarkable extent to which lawsuits can be turned into procedural entanglements. One view of this may be that the actions taken here represent nothing more than astute lawyering. Another is that the legal jockeying employed by both sides exhibits a proclivity to attempt to manipulate the rules for immediate tactical advantage — a use at odds with the purposes of these rules, and one dissonant with the equitable nature of class action proceedings.
 
 
 38
 Rather than enter this tenebrous world of procedural machinations, we think it preferable to address the Gonzalez plaintiffs' main arguments. As we discuss, the District Court's order was an appropriate exercise of its authority regardless of the status of the Texas opt-out order.
 
 IV.
 
 a. Anti-Injunction Act/All Writs Act.
 
 
 39
 The District Court issued PTO 1227 under the All Writs Act, which provides "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The power granted by the All Writs Act is limited by the Anti-Injunction Act, 28 U.S.C. § 2283, which prohibits, with certain specified exceptions, injunctions by federal courts that have the effect of staying a state court proceeding. Appellants contend the District Court's order was prohibited by the Anti-Injunction Act. American Home Products and the Brown plaintiffs claim the injunction falls under one of the Act's exceptions. We hold the District Court's order was not barred by the Anti Injunction Act and was a valid exercise of its power under the All Writs Act.
 
 
 40
 The Anti-Injunction Act prohibits most injunctions "to stay proceedings in a State court." 28 U.S.C. § 2283.[10] Insofar as PTO 1227 enjoined Gonzalez class counsel, and those working in concert, from pursuing the opt out contemplated by the Texas opt-out order, it operated to stay the proceedings in the Hidalgo County court, if only indirectly. An order directed at the parties and their representatives, but not at the court itself, does not remove it from the scope of the Anti-Injunction Act. "It is settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties...." Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). Therefore, to the extent PTO 1227 had the effect of staying the Hidalgo County court's proceedings, it was prohibited by the Anti-Injunction Act, unless it fell within one of the Act's exceptions.
 
 
 41
 By its terms, the Anti-Injunction Act allows such injunctions "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. None of the parties suggests the injunction was expressly authorized by an act of Congress, or the injunction was aimed at protecting or effectuating a judgment of the District Court.[11] Accordingly, the injunction evades the Act's restrictions only if it was "necessary in aid of its jurisdiction."
 
 
 42
 The exceptions in the Anti-Injunction Act are to be construed narrowly. "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." Atl. Coast, 398 U.S. at 297, 90 S.Ct. 1739. These "exceptions are narrow and are not to be enlarged by loose statutory construction." Chick Kam Choo, 486 U.S. at 146, 108 S.Ct. 1684 (citation and alterations omitted); Prudential, 261 F.3d at 364.
 
 
 43
 In Atlantic Coast, the Court emphasized an order directed at a state court proceeding must be necessary in aid of jurisdiction — "it is not enough that the requested injunction is related to that jurisdiction." 398 U.S. at 295, 90 S.Ct. 1739. Acknowledging the language is nonetheless broad, the Court elaborated: an injunction is necessary in aid of a court's jurisdiction only if "some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Id.
 
 
 44
 Without more, it may not be sufficient that prior resolution of a state court action will deprive a federal court of the opportunity to resolve the merits of a parallel action in federal court. "The traditional notion is that in personam actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the exception to § 2283 was intended to alter this balance." Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 642, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (plurality opinion). In ordinary actions in personam, "[e]ach court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principle of res adjudicata by the court in which the action is still pending...." Kline v. Burke Constr. Co., 260 U.S. 226, 230, 43 S.Ct. 79, 67 L.Ed. 226 (1922). Therefore, it may not be sufficient that state actions risk some measure of inconvenience or duplicative litigation. In re Baldwin-United Corp., 770 F.2d 328, 337 (2d Cir.1985). An injunction may issue, however, where "the state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir.1996). In other words, the state action must not simply threaten to reach judgment first, it must interfere with the federal court's own path to judgment.
 
 
 45
 Several factors are relevant to determine whether sufficient interference is threatened to justify an injunction otherwise prohibited by the Anti-Injunction Act. First, we look to the nature of the federal action to determine what kinds of state court interference would sufficiently impair the federal proceeding. Second, we assess the state court's actions, in order to determine whether they present a sufficient threat to the federal action. And finally, we consider principles of federalism and comity, for a primary aim of the Anti-Injunction Act is "to prevent needless friction between the state and federal courts." Okla. Packing Co. v. Okla. Gas & Elec. Co., 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 537 (1940).
 
 
 46
 We turn first to the nature of the federal action. While, as noted, the "necessary in aid of jurisdiction" exception does not ordinarily permit injunctions merely to prevent duplicative actions in personam, federal courts are permitted to stay later-initiated state court proceedings over the same res in actions in rem, because "the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline, 260 U.S. at 229, 43 S.Ct. 79; see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 145 (3d Cir.1998) ("GM Trucks II"). Federal courts may also issue such injunctions to protect exclusive federal jurisdiction of a case that has been removed from state court. GM Trucks II, 134 F.3d at 145.
 
 
 47
 We have recognized another category of federal cases for which state court actions present a special threat to the jurisdiction of the federal court. Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction. Carlough v. Amchem Prods., Inc., 10 F.3d 189, 202-04 (3d Cir.1993). Carlough involved a nationwide class of plaintiffs and several defendants — primarily manufacturers of asbestos-related products — and third-party defendants — primarily insurance providers. We found the complexity of the case to be a substantial factor in justifying the injunction imposed. Id. at 202-03.
 
 
 48
 Implicit in Carlough is the recognition that maintaining "the federal court's flexibility and authority to decide" such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti-Injunction Act. Several other courts have concurred.[12] See, e.g., Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir.1998); Winkler, 101 F.3d at 1203 ("[T]he Anti-Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings."); Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir.1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir.1989); Baldwin-United, 770 F.2d at 337-38; In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1334-35 (5th Cir. Unit A 1981) (approving injunction in a "complicated antitrust action [that] has required a great deal of the district court's time and has necessitated that it maintain a flexible approach in resolving the various claims of the many parties."); In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 93 F.Supp.2d 876 (M.D.Tenn.2000); In re Lease Oil Antitrust Litig. No. II, 48 F.Supp.2d 699, 704 (S.D.Tex.1998); Harris v. Wells, 764 F.Supp. 743 (D.Conn.1991); In re Asbestos Sch. Litig., No. 83-0268, 1991 WL 61156 (E.D.Pa. Apr.16, 1991), aff'd mem., 950 F.2d 723 (3d Cir.1991); In re Joint E. & S. Dist. Asbestos Litig., 134 F.R.D. 32 (E.D.N.Y & S.D.N.Y 1990).
 
 
 49
 This is not to say that class actions are, by virtue of that categorization alone, exempt from the general rule that in personam cases must be permitted to proceed in parallel. See In re Glenn W. Turner Enters. Litig., 521 F.2d 775, 780 (3d Cir.1975). Federal courts ordinarily refrain from enjoining a state action even where the state court is asked to approve a settlement substantially similar to one the federal court has already rejected. GM Trucks II, 134 F.3d at 145. That a state court may resolve an issue first (which may operate as res judicata), is not by itself a sufficient threat to the federal court's jurisdiction that justifies an injunction, unless the proceedings in state courts threaten to "frustrate proceedings and disrupt the orderly resolution of the federal litigation." Winkler, 101 F.3d at 1202. Still, while the potentially preclusive effects of the state action may not themselves justify an injunction, they might do so indirectly. If, for example, the possibility of an earlier state court judgment is disruptive to settlement negotiations in federal court, the existence of the state court action might sufficiently interfere with the federal court's flexibility to justify an injunction.
 
 
 50
 The threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certifications and impending settlements in federal actions. Carlough, 10 F.3d at 203. Many — though not all — of the cases permitting injunctions in complex litigation cases involve injunctions issued as the parties approached settlement. E.g., Carlough; Baldwin United, 770 F.2d at 337; Corrugated Container, 659 F.2d at 1335; Asbestos Sch. Litig., 1991 WL 61156, at *3; Joint E. & S. Dist. Asbestos Litig., 134 F.R.D. at 36-37. But see Winkler, 101 F.3d at 1202 (protecting effect of discovery ruling); Harris, 764 F.Supp. at 745-46 (same). Complex cases in the later stages — where, for instance, settlement negotiations are underway — embody an enormous amount of time and expenditure of resources. It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding. These cases are especially vulnerable to parallel state actions that may "frustrate the district court's efforts to craft a settlement in the multi-district litigation before it," Carlough, 10 F.3d at 203 (quoting Baldwin-United, 770 F.2d at 337), thereby destroying the ability to achieve the benefits of consolidation. In complex cases where certification or settlement has received conditional approval, or perhaps even where settlement is pending, the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court. See id.
 
 
 51
 This case amply highlights these concerns. MDL 1203 represented the consolidation of over two thousand cases that had been filed in or removed to federal court. The Brown class finally certified comprised six million members. The District Court entered well over one thousand orders in the case. This massive consolidation enabled the possibility of a global resolution that promised to minimize the various difficulties associated with duplicative and competing lawsuits. The central events in this dispute occurred after two years of exhaustive work by the parties and the District Court, and after a conditional class certification and preliminary settlement had been negotiated and approved by the District Court. There can be no doubt that keeping this enormously complicated settlement process on track required careful management by the District Court. Any state court action that might interfere with the District Court's oversight of the settlement at that time, given the careful balancing it embodied, was a serious threat to the District Court's ability to manage the final stages of this complex litigation.[13] Duplicative and competing actions were substantially more likely to "frustrate proceedings and disrupt the orderly resolution" of this dispute at the time PTO 1227 was issued than they would be in ordinary actions in personam. Winkler, 101 F.3d at 1202. This is especially true where, as here, the litigants in state court have the ability to tailor their state actions to the terms of the pending federal settlement.
 
 
 52
 Determining the applicability of the Carlough rule also requires assessment of the character of the state court action, for we must assess the level of interference with the federal action actually threatened by the state court proceeding. In Carlough, our approval of the injunction was supported by the direct threat to the federal action the state court action represented. After the district court had provisionally certified the Carlough class, and after a preliminary settlement had been negotiated and presented to the court, a parallel action was filed in West Virginia. As here, the plaintiffs in that case — Gore v. Amchem Products, Inc. — sought an order of the state court opting out the members of the West Virginia class from the federal class. 10 F.3d at 196. They also sought a declaration that Carlough would not be binding on the members of the West Virginia class. Id. at 195-96.
 
 
 53
 We viewed the filing of the West Virginia action as an intentional "preemptive strike" against the federal action. Id. at 203. The purpose of the West Virginia filing was "to challenge the propriety of the federal class action." Id. We found "it difficult to imagine a more detrimental effect upon the district court's ability to effectuate the settlement of this complex and far-reaching matter then would occur if the West Virginia state court was permitted to make a determination regarding the validity of the federal settlement." Id. at 204.
 
 
 54
 Also significant in Carlough was the threat posed by the attempt to secure a mass opt out. We noted that permitting a state court to issue such an order "would be disruptive to the district court's ongoing settlement management and would jeopardize the settlement's fruition." Id. Additionally, we noted the confusion that would likely result among West Virginia residents as to their status in the "dueling lawsuits." Id. All of this amounted to direct interference with the district court's ability to manage the federal action effectively.
 
 
 55
 The interference that would have been caused by the Hidalgo County court's order implicates the same concerns that animated our decision in Carlough. The Texas court's order directly affected the identity of the parties to MDL 1203 and did so contrary to a previous District Court order. It sought to "declare what the federal court should and should not do with respect to the federal settlement." GM Trucks II, 134 F.3d at 145. Furthermore, as in Carlough, the Texas order would have created confusion among those who were members of both the federal and the state classes. It would be difficult to discern which, if any, action one was a party to, especially since the Texas order was entered during, and shortly before the end of, the MDL 1203 opt-out period.
 
 
 56
 Attempting to distinguish their case from Carlough, appellants contend their action cannot be characterized as a preemptive strike against the federal action because the Gonzalez action was filed before the creation of MDL 1203. Cf. GM Trucks II, 134 F.3d at 145 (distinguishing the state court action there at issue as not falling under this characterization). Yet we do not believe a state court action must necessarily be a preemptive strike before meriting the Carlough exception. The test, as always, is whether the state court proceeding "so interfer[es] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atl. Coast, 398 U.S. at 295, 90 S.Ct. 1739. Of course, where a state court proceeding amounts to an attack on a federal action, we are more likely to find significant interference. We are also less likely to find that comity demands deference to the state court action. But there are any number of factors that may play a role, and we do not understand either Carlough or GM Trucks II to hold that this element is necessary, in all cases, for application of the exception.
 
 
 57
 In any event, appellants' attempt to distinguish Carlough on this ground fails. While the relative timing of the filing of the actions makes clear that Gonzalez was not filed as a preemptive strike on MDL 1203, there is no doubt the motion requesting the Texas court to opt Gonzalez class members out of the Brown class was a preemptive strike. The District Court found it necessary to enjoin only the part of the action that directly — and by design — interfered with the federal action.[14]
 
 
 58
 Because an injunction must be necessary in aid of jurisdiction to fall under this application to the Anti Injunction Act, it is important to carefully tailor such injunctions to meet the needs of the case. Notably, the relief we approved in Carlough was substantially broader than the relief granted by the District Court here. The federal order in Carlough enjoined the West Virginia plaintiffs, as well as their attorneys and representatives, from pursuing the Gore action or initiating similar litigation in any other forum. 10 F.3d at 196. The injunction in Carlough effectively stayed the entire parallel state action, not only the attempted opt out, or other portions directed squarely at the federal action. Here, by contrast, the District Court's order enjoined only the pursuit of the attempted mass opt out-the part of Gonzalez that unquestionably interfered with the management of MDL 1203. It did not prevent the Gonzalez plaintiffs from individually opting out. Furthermore, the injunction was not directed at a proceeding in which plaintiffs had merely requested relief that threatened to interfere with the federal action, it was directed at a proceeding in which the state court had actually granted such a request, making the interference substantially more manifest. Under these circumstances, we find the District Court's injunction to be well within its "sound discretion." Carlough, 10 F.3d at 204.
 
 
 59
 The propriety of an injunction directed at the Texas order is also consistent with considerations of federalism and comity. The Texas plaintiffs who wished to opt out of the Brown class were given an adequate opportunity to individually opt out of the federal action, a factor we found significant in Carlough, 10 F.3d at 203-04. As such, Texas residents retained the option to commence lawsuits in the forum of their choice. Id. at 203. Furthermore, the injunction only prevented application of a particular order that was directed squarely at the federal action. Cf. Baldwin-United, 770 F.2d at 337 ("To the extent that the impending state court suits were vexatious and harassing, our interest in preserving federalism and comity with the state courts is not significantly disturbed by the issuance of injunctive relief."). It did not so much interfere with the state court proceeding as prevent state court interference with the federal proceeding. Failing to act on the Hidalgo County order threatened to "create the very `needless friction between state and federal courts' which the Anti Injunction Act was designed to prevent." Winkler, 101 F.3d at 1203 (quoting Okla. Packing Co., 309 U.S. at 9, 60 S.Ct. 215). "While the Anti-Injunction Act is designed to avoid disharmony between federal and state systems, the exception in § 2283 reflects congressional recognition that injunctions may sometimes be necessary in order to avoid that disharmony." Amalgamated Sugar Co. v. NL Indus., Inc., 825 F.2d 634, 639 (2d Cir.1987).
 
 
 60
 The District Court's order clearly falls under the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act. The complexity of this multidistrict class action in its mature stages — with a provisionally certified class and preliminarily approved settlement — entailed that the District Court required flexibility to bring the case to judgment. The nature of the Texas order was such that the required flexibility and eventual resolution were directly threatened. Finally, the principle embodied in the Anti Injunction Act that federal courts maintain respect for state court proceedings is not undermined by the issuance of the injunction.
 
 
 61
 Our holding that PTO 1227 was necessary in aid of the District Court's jurisdiction for purposes of the Anti Injunction Act necessarily implies it was authorized under the All Writs Act as well. For the All Writs Act grants federal courts the authority to issue all writs "necessary or appropriate in aid" of a court's jurisdiction. 28 U.S.C. § 1651(a). Insofar as it also permits writs "appropriate in aid" of jurisdiction, the court's authority to issue writs is, if anything, broader than the exception contained in the Anti-Injunction Act. But since "[t]he parallel `necessary in aid of jurisdiction' language is construed similarly in both the All Writs Act and the Anti-Injunction Act," a finding that an injunction is "necessary in aid" of jurisdiction for purposes of one these statutes implies its necessity for purposes of the other. Prudential, 261 F.3d at 365; Carlough, 10 F.3d at 201-02 n. 9. Accordingly, the District Court was empowered to issue PTO 1227 under the All Writs Act, and was not prevented from doing so by the Anti-Injunction Act.
 
 
 b. Full Faith and Credit Act.
 
 
 62
 As noted, the Hidalgo County court order opting out Texas class members supported a finding that its action sufficiently interfered with MDL 1203 to justify application of an exception to the Anti-Injunction Act. But appellants contend the Texas order invoked the protections of the Full Faith and Credit Act, 28 U.S.C. § 1738. Once issued, they argue, the order was entitled to full faith and credit, foreclosing the District Court's authority to issue a contrary order, even if permitted under the Anti-Injunction Act.
 
 
 63
 The Full Faith and Credit Act provides, "The ... judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738.
 
 
 64
 Where applicable, the Act "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering State." Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). Under Texas law, "[c]ollateral estoppel will bar relitigation of an issue if the facts sought to be litigated in the first action were fully and fairly litigated in the prior action, those facts were essential to the judgment in the first action, and the parties were cast as adversaries in the first action." Texacadian Energy, Inc. v. Lone Star Energy Storage, Inc., 829 S.W.2d 369, 373 (Tex.App.-Corpus Christi 1992). But "[i]nterlocutory orders on matters that are simply collateral or incidental to the main suit do not operate as res judicata or collateral estoppel." Id. "The trial court ... retains continuing control over interlocutory orders and has the power to set those orders aside any time before a final judgment is entered." Fruehauf Corp. v. Carrillo, 848 S.W.2d 83, 84 (Tex. 1993).
 
 
 65
 The Texas order was "collateral or incidental to the main suit." "An order or judgment that is merely a ruling on a technical or procedural aspect of a case is not res judicata." Starnes v. Holloway, 779 S.W.2d 86, 93 (Tex.App.-Dallas 1989). The Texas court's order was a procedural one that had no direct effect on the substance of the Gonzalez action. Cf. Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352 (Tex.2001) (order affecting likelihood of opt outs interlocutory and therefore not appealable). Accordingly, it was not entitled to preclusive effect under the Full Faith and Credit Act.
 
 c. The Rooker-Feldman Doctrine.
 
 66
 Appellants claim PTO 1227 exceeded the District Court's authority under the related Rooker-Feldman doctrine, which prohibits review of state court decisions by federal courts other than the United States Supreme Court. D.C. Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). According to the Gonzalez plaintiffs, the District Court did so in declaring the Texas order "null and void and without effect."
 
 
 67
 Under the Rooker-Feldman doctrine, inferior federal courts lack subject matter jurisdiction to review, directly or indirectly, state court adjudications. Rooker, 263 U.S. at 416, 44 S.Ct. 149. Review of such adjudications must be pursued in the state appellate system, and, if necessary, by way of review of the state's highest court in the United States Supreme Court.
 
 
 68
 In most cases, where consideration of an issue is precluded under the Rooker-Feldman doctrine, the issue will also be res judicata, and therefore precluded from consideration under the Full Faith and Credit Clause. And conversely, an issue that is res judicata will ordinarily be subject to the Rooker-Feldman doctrine's prohibition. The Rooker-Feldman doctrin differs from ordinary preclusion, however, in that it is jurisdictional.[15]
 
 
 69
 We have ordinarily applied the doctrine to prevent review of final decisions of state courts. See GM Trucks II, 134 F.3d at 143; FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir.1996). In Port Authority Police Benevolent Association v. Port Authority Police Department, 973 F.2d 169 (3d Cir.1992), however, we found the doctrine precluded review of a preliminary injunction issued by a state court. Id. at 178 (finding the doctrine applicable because "the preliminary injunction issued by the New York trial court ... resolved, at least for the moment, the dispute between the parties which forms the basis of the federal complaint at issue in this case"). We need not decide here the extent to which the doctrine is to apply to other kinds of interlocutory orders — and, in particular, procedural ones — because we believe, in any event, the District Court's order did not constitute "review" for purposes of the Rooker-Feldman doctrine.
 
 
 70
 American Home Products argues — correctly in our view — that the District Court did not review the Texas opt-out order, it simply applied its indisputable authority to determine the opt-out rules for the plaintiff class before it, and to determine who had properly opted out under those rules. Making determinations concerning the identity of the parties to a case before it is at the core of the District Court's authority. The Texas opt-out order purported to make a determination with respect to the parties to the federal action. It was, in other words, effectively an attempt to make an interlocutory procedural ruling in a case pending before another court.
 
 
 71
 As noted, the manifest impropriety of the Texas order does not justify its review by the District Court. Errors are to be corrected by appeal through the state system. But regardless of whether the Texas order was entered in error, there was a significant question of what effect that order would have on MDL 1203. The District Court had earlier determined that lawyers could not effect mass opt outs of all of their clients with the filing of a single notice, holding that "[o]pting out is an individual right and it must be exercised individually." Just as it was clearly within the court's discretion to turn away attempts by lawyers to opt out class members en masse, it was within the court's authority to determine the effect of the Texas opt-out order within MDL 1203.
 
 
 72
 We have said that "Rooker-Feldman precludes a federal action if the relief requested in the federal action would effectively reverse the state decision or void its ruling." FOCUS, 75 F.3d at 840 (quoting Charchenko v. City of Stillwater, 47 F.3d 981, 983 (8th Cir.1995)). PTO 1227 had the effect of voiding the Texas court's order, but only insofar as it had an effect on the management of MDL 1203 — an area in which the district courts' discretion must be preserved. The Rooker-Feldman doctrine does not work to defeat a district court's authority over the management of its own case. Because PTO 1227 did not reach beyond that authority, it did not run afoul of the Rooker-Feldman doctrine.
 
 
 73
 Appellants' approach would permit a state court to issue orders directed squarely at the inner workings of federal cases, subject only to reversal by superior state courts and the United States Supreme Court. This approach would undermine the federalism values the doctrine seeks to protect. We have recognized the doctrine seeks to preserve finality and respect for state courts. Guarino v. Larsen, 11 F.3d 1151, 1157 (3d Cir.1993). But permitting a state court to interfere with a federal court's management of its cases would serve neither purpose and would facilitate the kind of interference between state and federal courts the doctrine is meant to avoid. Accordingly, we hold that where, as here, a federal court's proper exercise of its jurisdiction to manage its cases has the secondary effect of voiding a state court determination, it is not a review of that order for purposes of the Rooker-Feldman doctrine.
 
 V.
 
 74
 For the foregoing reasons, we will affirm the order issued by the District Court.
 
 
 
 Notes:
 
 
 [1]
 Because theGonzalez class included only persons "who are solely seeking the recovery of the amounts to acquire" Redux and Pondimin, it is unclear whether any claims would remain within MDL 1203 for opted-out Gonzalez class members. In any event, there is no need to resolve this issue at this time.
 
 
 [2]
 As noted, on March 23, the District Court for the Eastern District of Pennsylvania had issued a temporary restraining order directed against the relief sought at the Texas hearing
 
 
 [3]
 For clarity, we include the following time line of the relevant events:
 1997:

 July 31: Gonzalez filed in Hidalgo
 County, Texas.
 Dec. 10: MDL 1203 created.
1998:

 Jan. 20: First Gonzalez removal.
 Jan. 26: First motion to remand filed.
 Aug. 19: Gonzalez transferred to the
 E.D. Pa.
1999:

 Nov. 23: Conditional certification of
 Brown class; preliminary
 approval of settlement; commencement
 of opt-out period.
2000:

 Feb. 15: Gonzalez remanded.
 Mar. 14: Fifth Amended Class Action
 Petition filed in Gonzalez.
 Mar. 20: Hearing on Gonzalez class
 certification.
 Mar. 23: TRO hearing and order (11:55)
 against Texas opt out. Hearing
 and order (before 11:55)
 opting out Gonzalez class.
 Mar. 28: Second notice of removal filed.
 Motion for permanent injunction
 filed.
 Mar. 29: Hearing on permanent injunction.
 Mar. 30: End of opt-out period.
 Apr. 6: Permanent injunction/declaration
 (PTO 1227) entered.
 Apr. 26: Second motion to remand filed.
 Apr. 27: Notice of appeal of PTO 1227
 filed by Gonzalez plaintiffs.
 May 1-11: Fairness hearing on settlement.
 May 3: S.D. Tex. declines consideration
 of remand pending transfer.
 May 12: Gonzalez transferred from S.D.
 Tex. to E.D. Pa. as part of
 MDL 1203.
 Aug. 28: Final approval of settlement and
 certification of Brown class.
 
 
 [4]
 Appellants raise two issues that need not detain us. First, they claim the District Court did not have subject matter jurisdiction because the amount-in-controversy requirement for diversity jurisdiction was not met in theGonzalez case. This appeal, however, is from an order in MDL 1203, over which the District Court undisputedly had subject matter jurisdiction.
 Second, they claim the District Court failed to adhere to the requirements of the Declaratory Judgment Act, 28 U.S.C. § 2201, which lists certain pleading requirements allegedly not met by American Home Products. Because the District Court's order cannot properly be viewed as a declaratory judgment under the Declaratory Judgment Act, however, this statute and its requirements are not relevant.
 
 
 [5]
 Because the present appeal is of an interlocutory order, our jurisdiction is limited. We have jurisdiction to review the District Court's injunction under 28 U.S.C. § 1292(a)(1), which permits review of "[i]nterlocutory orders of the district courts of the United States... granting, continuing, modifying, refusing or dissolving injunctions...." We have pendant appellate jurisdiction over the issue of personal jurisdiction, because, in this case, that issue "bear[s] upon the propriety of the preliminary injunction."Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp., 861 F.2d 793, 796 (3d Cir.1988).
 
 
 [6]
 Removal is effective upon filing a notice of removal in both the relevant federal and state courts, and providing notice to the other parties. 28 U.S.C. § 1446(a), (d). At that time, "the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). "A proper filing of a notice of removal immediately strips the state court of its jurisdiction."Yarnevic v. Brink's, Inc., 102 F.3d 753, 754 (4th Cir.1996). Thus, even if a case is later remanded, it is under the sole jurisdiction of the federal court from the time of filing until the court remands it back to state court. California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States, 215 F.3d 1005, 1011 (9th Cir.2000) ("[F]urther proceedings in a state court are considered coram non judice and will be vacated even if the case is later remanded.") (citing 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3737 (3d ed. 1998)).
 
 
 [7]
 "Whenever any action is removed from a State court to a district court of the United States, ... [a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450. "In sum, whenever a case is removed, interlocutory state court orders are transformed by operation of 28 U.S.C. § 1450 into orders of the federal district court to which the action is removed. The district court is thereupon free to treat the order as it would any such interlocutory order it might itself have entered."Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1304 (5th Cir.1988).
 
 
 [8]
 The removal statute, 28 U.S.C. §§ 1441-52, does not categorically prohibit the filing of a second removal petition following remandDoe v. Am. Red Cross, 14 F.3d 196, 200 (3d Cir.1993). As stated in a leading treatise, "[I]f subsequent pleadings or conduct by the parties or various other circumstances brings a case that was not previously removable within the removal jurisdiction of the federal courts, a second notice of removal is permissible." 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3739, 495-96 (3d ed.1998).
 
 
 [9]
 We recognize that federal district courts can, in most cases, prevent parties from successfully manipulating the removal rules in this way. Ruling on the validity of the removal before issuing orders conflicting with state court orders will permit the state court orders to continue to be effective until the case is remanded, or until the district court determines it will maintain jurisdiction over the case. In such cases, the filing of an invalid or questionable removal petition cannot, by itself, defeat the operation of the state court order. In this case, because the removal notice was filed in the Southern District of Texas, the District Court was not afforded an opportunity to so rule. Thus, the District Court — quite blamelessly — did not address the merits of the second removal
 
 
 [10]
 The Anti-Injunction Act does "not preclude injunctions against the institution of state court proceedings, but only bar[s] stays of suits already instituted."Dombrowski v. Pfister, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).
 
 
 [11]
 The exception allowing injunctions necessary "to protect or effectuate ... judgments" applies only where a preclusive judgment has been made. "The exception `is founded in the well-recognized concepts of res judicata and collateral estoppel.'" "`[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in the state proceedings [must] actually have been decided by the federal court.'"In re Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 364 (3d Cir.2001) (quoting Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 147-48, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988) (alterations in original)).
 
 
 [12]
 In several cases, courts have analogized complex litigation cases to actions in rem. As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control."Baldwin-United, 770 F.2d at 337; see also Wesch, 6 F.3d at 1470; Battle 877 F.2d at 882 ("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered."). The in rem analogy may help to bring into focus what makes these cases stand apart. In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline, 260 U.S. at 229, 43 S.Ct. 79. Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction. See Baldwin-United, 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts") (quoting 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 4225, at 105 n. 8 (Supp.1985)). What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case." Atl. Coast, 398 U.S. at 295, 90 S.Ct. 1739.
 
 
 [13]
 Among other vulnerabilities, it is worth highlighting one example. The settlement agreement in this case expressly permitted American Home Products to terminate the settlement agreement, at its discretion, based on the number of opt outs. That provision was, of course, created with the complicated opt-out provisions crafted specifically for MDL 1203 in mind. External actions that would disturb that balance, by altering the number of opt outs through a different mechanism, clearly would substantially interfere with MDL 1203
 
 
 [14]
 Even if the District Court had, as inCarlough, enjoined the state court action in toto, it is far from clear that the fact that Gonzalez was filed before the creation of MDL 1203 would be dispositive. It is conceivable that an earlier filed state court action might present just as great an interference with the federal proceeding as a later filed state action. While the prior filing of a state action will generally be a factor, and may, in certain circumstances, be dispositive, there is no apparent value in adopting a rigid rule to that effect.
 
 
 [15]
 The substantial overlap of the two doctrines has led some commentators to call into question the utility of recognizing this additional, jurisdictional bar to consideration of state judgments. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,Federal Practice and Procedure § 4469.1, at 657-58 (Supp.2001) ("All of the desirable results achieved by the jurisdiction theory could be achieved by supplementing preclusion theory with familiar theories of abstention, comity, and equitable restraint."); see also Thomas D. Rowe, Jr., Rooker-Feldman: Worth Only the Powder to Blow It Up?, 74 Notre Dame L.Rev. 1081 (1999).