

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2004

# In Re: Diet Drugs

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-4581

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Diet Drugs " (2004). *2004 Decisions.* Paper 989.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/989

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4581

IN RE: DIET DRUGS (PHENTERMINE/
FENFLURAMINE/DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

> Hariton & D'Angelo, LLP and Napoli, Kaiser,
> Bern & Associates, LLP, on behalf of
> themselves and their clients who are specifically
> identified and/or whose claims are affected by
> Pretrial Order No. 2677,
>
> <u>Appellants</u>

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(MDL  No. 1203)
District Judge: Honorable Harvey Bartle, III

Submitted Pursuant to LAR 34.1(a)
December 10, 2003

Before: AMBRO, FUENTES and CHERTOFF, <u>Circuit Judges</u>

(Filed February 23, 2004)

OPINION

Chertoff, <u>Circuit Judge</u>

This appeal is taken from the District Court's Pretrial Order (PTO) No. 2677 by two law firms on behalf of class members who had previously settled their mass tort claims in the MDL 1203 Diet Drug litigation. The PTO in question extended certain deadlines established under the settlement. Because we conclude that the District Court's extension of the deadlines was a permissible exercise of its discretion, we will affirm.

**I.**

We have previously set forth the basic facts in the Diet Drug litigation. <u>See</u> <u>In re Diet Drugs</u>, 282 F.3d 230 (3d Cir. 2002). Because this opinion is written only for the parties, we recite only the facts relevant to our decision.

Before 1997, Wyeth, then named American Home Products,[1] sold two prescription drugs for the treatment of obesity, Pondimin and Redux. In September 1997, the United States Food and Drug Administration (FDA) issued a press release stating that a "higher than expected percentage of" patients taking the drugs "had abnormal echocardiograms, even though they had no symptoms."[2] Supplemental App. at 779. In response to that

---

[1] American Home Products changed its name to Wyeth in March 2002. We use the name Wyeth.

[2] In addition to identifying the concern – echocardiogram abnormalities – the FDA press release recommended that patients taking either of the two drugs contact their physician. Contemporaneously with the FDA press release, Wyeth placed full-page advertisements in national newspapers announcing the withdrawal and recommending that Pondimin or Redux patients "contact their physician." Supplemental App. at 781-88. Also reported in the national media, the United States Department of Health and Human

press release, Wyeth voluntarily withdrew the products from the market. Prior to Wyeth having done so, however, some 5.8 million individuals had used one or the other of the two drugs. Subsequent studies suggest that the drugs may be linked to serious cardiopulmonary side effects – primarily, heart valve regurgitation (the reverse flow of blood through a closed valve of the heart). It is those side effects that are the subject of the Diet Drug litigation at hand.

The federal Diet Drug actions were consolidated for pretrial purposes in the Eastern District of Pennsylvania pursuant to MDL 1203 and, in 1999, Wyeth entered into a Nationwide Class Action Settlement Agreement (the "Settlement Agreement"), executed and approved in that court. Notice to the class explained the nature of the injuries claimed by the plaintiffs and that diagnosis of those injuries (and therefore potential qualification for participation in the Settlement Agreement) was possible through an echocardiogram. The Settlement Agreement was approved by the District Court in August 2000, and it became final on January 3, 2002 (after the exhaustion of all appeals). The Settlement Agreement established, inter alia, a trust (the "Settlement Trust") to administer Wyeth's obligations under the Settlement Agreement.

As a threshold for qualifying for certain awards under the Settlement Agreement, class members needed to submit echocardiograms that reported a finding of at least mild

---

Services published on November 14, 1997, a health recommendation that former Pondimin and Redux users see their physicians to have "an echocardiographic evaluation . . . performed." Supplemental App. at 793-99.

mitral valvular regurgitation. Class members had the option of using privately obtained echocardiograms or, if they met certain requirements, obtaining free echocardiogram screening through a program established by the Settlement Agreement (the "Screening Program"). In order to avail themselves of the free screening, however, class members needed to register with the Settlement Trust by August 1, 2002. Under the original settlement, class members had until one year after the finalization of the Settlement Agreement – that is, until January 3, 2003 – to obtain their echocardiographic showing of injury by whatever means they chose.

At some point in 2002, it became clear that, as a practical matter, the Settlement Trust would not be able to administer echocardiograms to all of the class members who had registered for free screening under the Screening Program. This was due to the unexpectedly large influx of requests to take part in the Screening Program. In response, Wyeth and Class Counsel executed a proposed Fifth Amendment to the Settlement Agreement on September 23, 2002.[3] Wyeth and class counsel jointly moved the District Court to approve the amendment and served counsel for all represented plaintiffs (who had not waived service) with notice of the proposed amendment. In addition, the joint motion and the terms of the proposed amendment were posted on the settlement and official MDL 1203 websites.

_____

[3] Before the District Court's approval of the Settlement Agreement in August 2000, the Settlement Agreement had been amended four times. For convenience, we will refer to the Settlement Agreement as it stood prior to approval of the Fifth Amendment as the "original" settlement.

The original Settlement Agreement read:

49. "Screening Period" refers to the 12-month period (or such longer period that shall be permitted by the Court for good cause shown, but in any case not to exceed 18 months) during which benefits shall be available under the Screening Program.

J.A. 604. The revised language proposed in the Fifth Amendment provides instead:

49. "Screening Period" refers to the 12-month period beginning on the Final Judicial Approval Date during which benefits shall be available in the Screening Program. Class Members who have timely registered for benefits by Date 1 and who are otherwise eligible for Screening Program benefits may receive the Echocardiogram and associated interpretive physician visit benefits after the end of this Screening Period, provided that : (i) all such Echocardiograms must be conducted no later than July 3, 2003, unless the Court, upon a showing of good cause and due diligence by or on behalf of a Class Member or group of Class members, allows the Class Member or group of Class Members to receive an Echocardiogram and associated interpretive physician visit after such date; and (ii) any Class Member who receives an Echocardiogram provided by the [Settlement] Trust after the end of the Screening Period shall be considered to have been diagnosed during the Screening Period for all purposes under this Settlement Agreement, and shall have a period of 120 days after the date of the Echocardiogram to exercise, if otherwise eligible, a right of Intermediate Opt-Out under Section IV.D.3.b.

J.A. 1226. The amended language effectively extended the period of time during which proof of injury could be submitted by class members whose echocardiographic evaluation was delayed by the influx of Screening Program participants (the "delayed class members"). The language left intact the filing deadlines for all other class members (the "non-delayed class members") – that is, class members who had already received their echocardiographic evaluation through the Screening Program and class members not

5

participating in the Screening Program (i.e., class members who had privately sought echocardiograms).

On November 7, 2002, appellants filed a cross-motion, on behalf of their non-delayed class member clients, in which they agreed that the District Court should approve the extension of the screening period under the proposed amendment. But they asked that the District Court, for good cause, extend the Screening Period through July 3, 2003 for all class members, including non-delayed class members. On October 9, 2002 and November 21, 2002, the District Court held hearings to consider the propriety of approving the proposed Fifth Amendment and appellants' cross-motion. On December 11, 2002, the District Court issued PTO 2677, approving the Fifth Amendment, and a memorandum supporting its decision.[4] This timely appeal followed.

## II.

### A.

There is some conflict with respect to our standard of review. The appeal raises four issues: (1) whether the District Court's approval of the Fifth Amendment resulted in impermissible disparate treatment of some class members; (2) whether the District Court violated Federal Rule of Civil Procedure 23 by imposing a settlement agreement without sufficient hearings or notice to class members; (3) whether the District Court erred in determining that appellants had not shown good cause to extend filing deadlines for all

---

[4] The only issues before the District Court were those presented in this appeal. PTO 2677 disposed of those issues and is a final order for purposes of 28 U.S.C. § 1291.

class members; and (4) whether class counsel's representation was inadequate with respect to the Fifth Amendment.

Appellants, although they do not address the question of this Court's standard of review in their opening briefs, obliquely contend that we should conduct plenary review over the first issue, arguing that the issue "is essentially one of law and logic." Appellants' Reply Br. at 14. We disagree. The District Court's approval of the Fifth Amendment does not, as appellants claim, implicate questions of whether the District Court complied with the strictures of Rule 23 or provided the due process to which class members are entitled. Rather, the issue is whether the District Court, in its continuing jurisdiction to oversee class action settlements, see In re Prudential Ins. Co. of America Sales Practice Litig., 261 F.3d 355, 367 (3d Cir. 2001), erred in approving a modification of the settlement. This Court reviews a District Court's approval of settlements in class actions for an abuse of discretion. See Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). We will, therefore, review the District Court's determination to approve the Fifth Amendment for an abuse of discretion.

With respect to appellants' second issue, Girsh, by extension, leaves to the district court's discretion the number of hearings that are appropriate before a class action settlement is approved. See id. Moreover, Federal Rule of Civil Procedure 23(e) itself makes clear that determinations about settlement notices in class actions are within the discretion of the district court. See Fed. R. Civ. P. 23(e). We will, therefore, exercise

7

abuse of discretion review over appellants' second issue.

With respect to appellants' third issue, we review a district court's determination of good cause in administering settlements for an abuse of discretion. See, e.g., In re Cendant Corp. Prides Litig., 233 F.3d 188, 192 (3d Cir. 2000); Del. Valley Citizens' Council for Clean Air v. Pennsylvania, 674 F.2d 976, 980 (3d Cir. 1982). Finally, because the question of adequacy of class counsel representation implicates due process concerns, we will exercise plenary review over appellants' fourth issue. See Ortiz v. Fireboard Corp., 527 U.S. 815 (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

**B.**

Appellants first challenge the District Court's approval of the Fifth Amendment by arguing that the Fifth Amendment "result[ed] in impermissible disparate treatment where one discrete subclass . . . received a benefit . . . at the expense of the remaining class members in violation of Fed. R. Civ. P. 23." Appellants' Br. at 2.

The amended language provides that delayed class members would receive their echocardiogram evaluation in as timely a manner as the Settlement Trust could provide, but, in any event, not after July 3, 2003. Thus, if the evaluation were to occur after the deadline imposed by the original Settlement Agreement, delayed class members would not experience prejudice as a result of the Settlement Trust's inability to timely administer the evaluation.

PTO 2677 extended only those deadlines applicable to delayed class members – those who were adversely affected by the Settlement Trust's unforeseen inability to meet Screening Period deadlines. The Fifth Amendment does not address or affect the rights of those class members whose ability to obtain an echocardiogram was not affected by the Settlement Trust's delay in administering echocardiograms. Non-delayed class members continue to operate under the original Settlement Agreement deadlines.[5]

All class members were notified about the echocardiogram deadlines imposed by the original Settlement Agreement. They were also notified of the consequences of failing to meet the original deadlines. Indeed, as the District Court observed, non-delayed class members were notified of the Settlement Agreement's echocardiogram deadlines some two years before the Settlement Agreement's clock began running against them, and had a full year to obtain a private echocardiographic evaluation before that clock ran out.[6]

---

[5] Appellants observe that the original settlement language permitted an extension for all class members of the January 3, 2003 echocardiogram deadline upon a showing of "good cause." Appellants complain that the Fifth Amendment, which lacks "good cause" language, now effectively precludes extensions for non-delayed class members even in the presence of good cause. Appellants claim, therefore, that the Fifth Amendment must fall because its omission of good cause extension language prejudiced the non-delayed class members. But appellants have not shown that any non-delayed class members were prevented from extending the deadline for good cause on the grounds that the Fifth Amendment precludes such an extension. Accordingly, such an argument is speculative and unripe.

[6] Indeed, under certain circumstances, echocardiograms showing proof of injury obtained prior to the Screening Period constituted sufficient proof of injury under the Settlement Agreement. In those cases, class members had some five years to obtain their echocardiographic proof of injury.

Rather than show some way in which the non-delayed class members were unfairly prejudiced by the Fifth Amendment, appellants simply assert that class action settlements cannot benefit one group of class members to the detriment of others. See, e.g., Hanlon v. Chrysler Corp., 150 F.3d 1011, 1027 (9th Cir. 1998); In re General Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1133-34 (7th Cir. 1979). While true, that principle is unhelpful to appellants. To be sure, a class action settlement cannot arbitrarily prefer one group of plaintiffs over another – because such a rule would be inimical to the very principle of class advocacy. But we are not aware of any rule of law that prohibits class action settlements from contouring its terms to differently-situated class members. In fact, equal treatment sometimes requires crafting settlement terms in a way that addresses the needs of differently-situated class members.

In this case, the Settlement Agreement clearly provides equal compensation for similarly injured class members. The only dispute in this appeal is whether the Fifth Amendment impermissibly distinguished between similarly situated class members with respect to certain deadlines for filing proof of injury. The District Court was well within its discretion in determining that delayed class members who had chosen to participate in the Screening Program, but who would be adversely affected by the Settlement Trust's own delays, were differently situated from class members who did not participate in the Screening Program, or whose Screening Program echocardiograms had already been completed (i.e., non-delayed class members). Similarly, the District Court was well

within its discretion to conclude that the Fifth Amendment, which extended the filing deadlines only for delayed class members, was necessary to maintain equal treatment among differently-situated class members.[7]

## C.

Appellants' second challenge is to the hearings held and notice provided by the District Court with respect to the Fifth Amendment. Appellants argue that the hearings held by the District Court and the notice provided to class members of the proposed amendment were deficient. We disagree. The representatives of all class members having active cases in MDL 1203 were notified of the proposed amendment. Those class members were provided a meaningful opportunity to object. Many did so and their concerns were incorporated into the amendment that the District Court ultimately approved. These are matters firmly within the discretion of a district court, see Girsh, 521 F.2d at 156; Fed. R. Civ. P. 23(e), and the District Court did not abuse its discretion.

## D.

Appellants next challenge the District Court's determination that there was not

---

[7] We note that appellants also contend that the District Court's approval of the Fifth Amendment should have revived non-delayed class members' initial opt-out rights. Appellants do not contend that the class members they represent were deprived of their pre-Settlement Agreement initial opt-out. Rather, appellants claim that the District Court's approval of the Fifth Amendment amounted to imposition of a materially different settlement, necessitating the reinstatement of class members' initial opt-out rights. Appellants are mistaken. The Fifth Amendment did not materially alter the Settlement Agreement. Rather, the amendment merely corrected an unexpected prejudice to some class members that arose after the Settlement Agreement was approved.

11

good cause to extend the filing deadlines for all class members, including non-delayed class members. As discussed above, the Fifth Amendment was intended to remedy an unanticipated problem that affected only delayed class members. The unforeseen flood of requests for participation in the Screening Program made timely processing of all Screening Program echocardiograms a practical impossibility. By definition, non-delayed class members were unaffected by the flood of Screening Program participation requests.

There was, therefore, no good cause to extend the deadlines for non-delayed class members. We affirm the District Court's exercise of discretion not to extend the filing deadlines universally.

**E.**

Appellants' final challenge is to the representation provided by class counsel. Appellants allege that class counsel was operating under a conflict of interest when it advocated for non-universal extension of the filing deadlines.

Class counsel was under no conflict of representation. As discussed above, certain of the class members were differently-situated with respect to filing deadlines and required advocacy accordingly. Class counsel provided that advocacy. That certain class members were differently situated with respect to filing deadlines should not be taken to mean that their overall interests diverged from that of the general class. To the contrary, the interests of the class as a whole remained the same – timely and appropriate compensation. A class counsel's overriding goal is to shepherd all class members toward

12

the larger goal in the manner best appropriate for each class member.  Cf. <u>Amchem Prods.</u>

<u>Inc. v. Windsor</u>, 521 U.S. 991 (1997).  Class counsel did not fail to do so here.

**III.**

For the foregoing reasons, the District Court, in PTO 2677, did not abuse its

discretion in approving the Fifth Amendment to the Settlement Agreement.  Nor did the

District Court abuse its discretion in denying appellants' request to universally extend the

filing deadlines.  Finally, Class Counsel did not act under a conflict of interest and

therefore did not provide inadequate representation.  The order of the District Court,

entered on December 11, 2002, will be affirmed.

_____