**In re: DIET DRUGS (PHENTER-MINE/FENFLURAMINE/DEXFEN-FLURAMINE) PRODUCTS LIABILI-TY LITIGATION,**

**Michelle Renee CORLEY, Appellant.**

**No. 03–4181.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 2003.

Decided March 12, 2004.

Kenneth W. Lewis, Jeffrey T. Roebuck (argued), Bush, Lewis & Roebuck, P.C., Beaumont, Texas, for Appellant Corley.

Robert D. Rosenbaum, M. Sean Laane (argued), Arnold & Porter, Washington, DC, Michael T. Scott, Paul B. Kerrigan, Reed Smith LLP, Philadelphia, PA, Peter L. Zimroth, Arnold & Porter, New York, NY, for Appellee Wyeth.

Before AMBRO, FUENTES and CHERTOFF, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

Appellant, Michelle Corley, appeals the decision of the United States District Court for the Eastern District of Pennsylvania enjoining her from litigating a settled claim against Appellee, Wyeth.

Corley argues that her unintended participation in a settlement with Wyeth resulted from "excusable neglect" because her former counsel failed to take the steps necessary for opting out of the settlement. We review the District Court's decision for abuse of discretion. Because we find that Corley is bound by the acts of her chosen counsel, we affirm the District Court's decision barring Corley from litigating her claim. We also affirm the District Court's decision denying Corley's request for further discovery.

## I.

We have previously set forth the basic facts in the Diet Drug litigation. *See In re Diet Drugs*, 282 F.3d 220 (3d Cir.2002). Because this opinion is written only for the parties, we recite only the facts relevant to our decision.

Prior to 1997, Wyeth, then named American Home Products,[1] sold two prescription drugs for the treatment of obesity, fenfluramine and dexfenfluramine, marketed as "Pondimin" and "Redux." In September 1997, the United States Food and Drug Administration (FDA) issued a press release reporting abnormal echocardiograms in a "higher than expected percentage of" patients taking the drugs. *See* Press Release, FDA, FDA Announces Withdrawal Fenfluramine and Dexfenfluramine (Fen–Phen) (Sept. 30, 1998). Subsequent studies suggested that the drugs may have been linked to serious cardiopulmonary side effects, including heart-valve regurgitation (the reverse flow of blood through a closed valve of the heart).

After the withdrawal of the diet drugs, 18,000 individual suits and 100 class actions were filed in state and federal courts.

---

1. American Home Products changed its name to Wyeth in March 2002. We use the name Wyeth.

In December 1997, the federal cases were consolidated for pretrial purposes in the Eastern District of Pennsylvania pursuant to MDL 1203. In November 1999, Wyeth entered into a nationwide class action settlement agreement with users of the diet drugs in the United States. After conducting fairness proceedings, the District Court in the Eastern District of Pennsylvania certified a settlement class and approved the settlement agreement, finding it "fair, reasonable and adequate." *See* Pretrial Order ("PTO") 1415. The settlement agreement became final on January 3, 2003, upon exhaustion of all appeals.

Diet drug users who wished to opt out of the settlement were required to file an "initial opt-out" form no later than March 30, 2000. Class members were informed of their initial opt-out rights through "an elaborate and extensive plan of notice." App. at 259–68, citing PTO 1415. Persons who timely exercised initial opt-out rights were free to pursue any and all claims against Wyeth. Those who did not remained members of the class and agreed to be bound by the conditions and benefits of the settlement agreement. Upon approving the settlement agreement, the District Court entered PTO 1415, which expressly "bars and enjoins" all class members "from asserting, and/or continuing to prosecute" any settled claim against Wyeth.[2] App. at 340–41.

The settlement agreement contained an exception to this bar, permitting class members who met specific physical requirements (diagnosed as having a severity of heart-valve regurgitation defined as "FDA Positive"), and who timely exercised their rights, to pursue "downstream" opt-out rights. Downstream opt-out rights fell into two categories: "intermediate" opt-out

and "back-end" opt-out. These rights allowed class members to pursue claims against Wyeth, subject to certain limitations, including a prohibition against "seek[ing] punitive, exemplary, or any multiple damages." App. at 85–86.

In July 1999, Corley sued Wyeth, along with other plaintiffs, in Texas state court. She sought damages for injuries from having used the diet drugs, including punitive damages. Although Corley acknowledges that she received actual notice of the settlement agreement before the initial opt-out deadline, she claims that her counsel failed to file a timely "initial opt-out" form. App. at 387–90. Instead, in July 2000, her counsel filed a "blue form," the official registration form for participating in the settlement.

About a year and a half later, in January 2001, Wyeth agreed to an "inventory" settlement with several claimants represented by Corley's then counsel, including her co-plaintiffs in the Texas lawsuit. Wyeth offered to include Corley in this non-class settlement, offering her $25,000. Corley declined the offer. At this point, her counsel sent her a letter requesting that she sign a verification of her rejection of the offer and terminating the attorney-client relationship. Corley Br. at 3. Corley did so, and subsequently retained present counsel.

It appears from the record that Corley's original counsel proceeded with the state court action as though Corley had opted out, but mistakenly filed the form for her to participate in the settlement. It was not until August 2002, when Wyeth filed its state court motion to dismiss Corley's action, that Corley became aware of

---

2. PTO 1415 further provides for the settlement court to retain "continuing and exclusive jurisdiction ... to administer, supervise, interpret and enforce the Settlement in accordance with its terms." App. at 342.

Wyeth's position that she had not properly opted out of the class. Corley Br. at 4.

In August 2002, Corley filed for intermediate opt-out rights. However, she indicated on the form that she did so "under protest," claiming that she should be able to litigate her pending state court case as if she were an initial opt-out. Therefore, also in August 2002, Corley filed an amended state court petition, attempting to sue Wyeth as an initial opt-out. She sought punitive damages in this petition. Corley filed an initial opt-out form in October 2002, long after the March 30, 2000 deadline had passed.

In response to Corley's petition, Wyeth moved for the District Court to enforce PTO 1415's injunction against the litigation of settled claims. Wyeth asked the Court to require Corley to proceed, if at all, as an intermediate opt-out, subject to the conditions placed on intermediate opt-outs under the settlement agreement.

Corley argued that her failure to file a timely initial opt-out constituted "excusable neglect" because her former counsel had failed to follow her instructions. App. at 465. She also claimed a need for discovery concerning the settlement offers that Wyeth made to her and other claimants.

The District Court conducted the "excusable neglect" analysis outlined in *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir.2001) (*Bone Screw*), and held that Corley should not be exempted from the initial opt-out deadline. *See* PTO 3030, App. at 2. The Court also found that "Wyeth would suffer unfair prejudice if [the Court] allowed Ms. Corley to effect an initial opt-out beyond the March 30, 2000 deadline" because the impact of any relaxation of the deadlines in her case would be multiplied many times "if others were similarly excused." *Id.; see also* PTO 2447 (No. 99–20593, May 16,

2002), incorporated by reference in PTO 3030, App. at 441–49. The District Court also denied Corley's request for discovery.

## II.

■ Corley bases her excusable neglect argument on the failure of her counsel to timely file for initial opt-out. We find, however, that there was no excusable neglect in this case. In evaluating excusable neglect, "clients must be held accountable for the acts and omissions of their attorneys." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 396, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). *See also Walker v. Sun Ship, Inc.*, 684 F.2d 266, 269 (3d Cir.1982) (stating that "a civil litigant is bound by the action or inaction of his attorney"). Under *Pioneer*, the analysis does not focus on whether the clients "did all they reasonably could in policing the conduct of their attorney," but "whether the neglect of [the clients] *and their counsel* was excusable." 507 U.S. at 396–97, 113 S.Ct. 1489 (emphasis in original).

In *Pioneer* we outlined four factors that a court should consider in determining whether a party's failure to act was a result of excusable neglect: "the danger of prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." 507 U.S. at 395, 113 S.Ct. 1489. Looking at the first of these factors, the District Court found that permitting an untimely initial opt-out would unduly prejudice Wyeth. If Corley were permitted to sue as an initial opt-out, she would be able to sue without the restrictions on punitive damages to which intermediate opt-outs are subject. Wyeth would, therefore, lose this benefit of the settlement agreement. Although Wyeth would still have to litigate

Corley's claim as an intermediate opt-out, Wyeth would be subject to significantly greater potential damages litigating Corley's claim as an initial opt-out.

Considering the second *Pioneer* factor, the District Court found that with millions of members in the class, the potential prejudice of allowing an exception to the initial opt-out deadline could extend beyond this case and have detrimental effects on the settlement and MDL. Wyeth points out that being able to determine the total number of initial opt-outs by a certain date was essential to the deal between Wyeth and the class. The settlement agreement actually granted Wyeth the right "to terminate the settlement agreement, at its discretion, based on the number of opt outs." *In re Diet Drugs*, 282 F.3d at 237 n. 13. The settlement was only beneficial to Wyeth if it could determine ahead of time whether the settlement would resolve most of the potential claims. "External actions that would disturb that balance, by altering the number of opt outs through a different mechanism, clearly would substantially interfere with MDL 1203." *Id.*

Corley refutes this point, arguing that the District Court did not rely on any evidence that motions similar to hers are pending or that there are any other claimants in Corley's position. Despite this assertion, we cannot say that the District Court abused its discretion in finding that leaving the door open for other potential claimants could threaten the settlement, particularly since Corley's claim of excusable neglect is "neither unique nor compelling." *See* PTO 2447, incorporated by reference in PTO 3030, App. at 447. Corley's counsel erred in filing the wrong form. The District Court addressed a similar situation involving a separate class action litigant. In *Schlosser*, PTO 2447, the District Court denied Schlosser's claim of excusable neglect for his attorney's failure to inform him of the need to affirmatively opt

out of the settlement after Wyeth had sent them both notice packets. *See* PTO 2447, App. at 441–49. The District Court in *Schlosser* found that "[t]he conduct of plaintiff's former counsel ... does not fall within the parameters of excusable neglect. On the contrary, counsel's conduct appears to have been patently inexcusable," considering that timely filing was within his control. *Id.* at 447. Similarly, timely filing in Corley's case was well within the control of her counsel, and, under the third *Pioneer* factor, a court should consider whether counsel did "all he reasonably could to comply with the court-ordered ... date." 507 U.S. at 396, 113 S.Ct. 1489. Despite the fact that Corley acted in good faith (also a consideration under *Pioneer*), the circumstances surrounding her counsel's mistake in filing the wrong form are neither unique nor compelling.

Further, under *Pioneer*, Corley cannot shift responsibility for failure to timely file to her counsel, particularly when both had actual and constructive notice of the deadline. PTO 1415 describes the "elaborate and extensive plan of notice" provided to class members. App. at 259–68. In addition, the record shows that Corley's counsel was aware of the deadline and filed timely opt-outs in other cases. App. at 524–26. This case is, therefore, distinguishable from *Pioneer*, where the Court found counsel's neglect in filing a timely bankruptcy claim excusable in light of the "dramatic" inadequacies in the notice provided. 507 U.S. at 398, 113 S.Ct. 1489. This case is also distinguishable from *Bone Screw*, in which excusable neglect was found, because this Court held that an untimely registrant lacked actual notice of the deadline and that the class was given only "minimal constructive notice" of the need to register for the settlement. 246 F.3d at 326–27. Although Corley argues that Wyeth's actions did not give her sufficient notice that she had failed to timely

opt out of the class, the *Bone Screw* notice analysis focuses on the adequacy of class notice given before the opt-out deadline, not after it has already passed. Corley Br. at 17.

Considering the importance of accurately calculating initial opt-outs (to the settlement and to Wyeth's anticipating damages) and the potential harm in allowing exceptions for claimants whose lawyers make avoidable mistakes, the District Court did not abuse its discretion in denying Corley's excusable neglect claim under *Pioneer*.

### III.

■ In addition to excusable neglect, Corley makes an estoppel argument, claiming that Wyeth took various actions that showed it regarded her as an initial opt-out, thus waiving its right to enforce PTO 1415 against her. The first of these actions occurred in June 2000 when Wyeth filed an abatement in the state court action.[3] Corley argues that Wyeth's motion to abate "[r]aises substantial questions as to the arrangement between Wyeth and [Corley's] former counsel" because, she contends, there would be no reason to abate her claim unless Wyeth recognized her as an initial opt-out. Corley Br. at 20. In addition, Corley cites to Wyeth's $25,000 settlement offer (in January 2001) as demonstrating an agreement between Wyeth and her former counsel to treat her as an initial opt-out.

In response, Wyeth contends that, in fact, several plaintiffs were included in the June 2000 abatement motion, some of whom had filed as initial opt-outs by the time of the motion and some of whom (including Corley) had not. App. at 530–53. Wyeth, therefore, contends that inclusion in this abatement motion did not reflect a claimant's opt-out status or Wyeth's

view of that status. Further, Wyeth claims it had reason to abate Corley's state court action, even though she filed to participate in the settlement, because Wyeth did not have a basis to seek dismissal of settled claims until January 3, 2002 when the settlement agreement obtained final judicial approval. App. at 154. We agree that Wyeth's decision to seek abatement of Corley's case rather than dismissal does not mean that Wyeth viewed her as having opt-out status.

■ In regard to the January 2001 settlement offer of $25,000, Wyeth contends that it was part of an "inventory" settlement, sent to Corley and other plaintiffs represented by her former counsel. The inventory settlement was an effort by Wyeth to manage its case load while waiting for approval of the settlement agreement. Wyeth argues that sending the offer does not show that it deemed Corley an initial opt-out because initial opt-outs were not the only persons who had potential future claims. Some class members who remained in the settlement still retained certain opportunities to litigate as, for example, a claimant with primary pulmonary hypertension or a claimant qualifying for other downstream opt-out rights. Wyeth Br. at 21, citing App. at 42–43, 85–90. Wyeth, therefore, asserts that sending a settlement offer is not sufficient to show that it had constructive notice of Corley's intent to opt-out despite her failure to timely file. We find this argument persuasive. In addition, the fact remains that Corley failed to file the initial opt-out form by the March 30, 2000 deadline, and the January 2001 offer in no way affected or induced this failure to timely file. We, therefore, agree with the District Court's conclusion that Wyeth did "nothing . . . that can be deemed to work an estoppel against it." App. at 3. Accordingly, we

---

3. Under the agreed motion to abate, the parties could proceed with certain paper discovery while deferring depositions, dispositive motions and trial.

find that the District Court did not abuse its discretion in dismissing Corley's estoppel argument as insufficient support for excusable neglect.

### IV.

▆ Related to Corley's estoppel argument is her request for additional discovery into any settlement offers Wyeth made to claimants like Corley who had not timely opted out. Corley argues that the District Court did not allow her time to conduct adequate discovery into the circumstances surrounding her former counsel's failure to properly file for initial opt-out. She contends that this discovery could reveal negotiations between her counsel and Wyeth over settlement and could establish that Wyeth had constructive notice of her intent to opt out. However, Corley's arguments do not persuade us that the District Court abused its discretion in denying further discovery.

First, Corley argues that any negotiations that may have occurred pertaining to the January 2001 settlement offer could reflect a waiver of the initial opt-out deadline and thus help to show excusable neglect. Corley Br. at 8, 9. However, as discussed above, any settlement offers extended before final approval of the settlement agreement are not indicative of a recipient's opt-out status.

Second, Corley cites to the June 2000 agreed motion to abate. Her former counsel agreed to this motion with Wyeth, although he did not include in it all of his clients who were plaintiffs in the state court action. Corley asserts that because her former counsel did not agree to include all of his clients, he and Wyeth must have been "in communication and negotiations at the time of the motion, and ... each plaintiff was discussed and a decision was made whether to include each plaintiff in the order." Corley Br. at 21. However, the record shows that Corley's counsel unilaterally selected the clients to be included and then provided the list to Wyeth. App. at 516, 530. Therefore, choosing plaintiffs included in the abatement motion fails to demonstrate communication between Wyeth and Corley's counsel.

Corley's misunderstanding as to her status as a settlement participant is understandable. She did not know that her former counsel filed the wrong form, and Wyeth did not immediately seek dismissal of her state court case. Nevertheless, we agree with the District Court's finding that her attorney's error was neither unique nor compelling. In short, Corley failed to demonstrate that further discovery would yield anything other than her counsel's mishandling of a filing that was reasonably within his control. We will, therefore, affirm the District Court's denial of Corley's request for discovery.